**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

MARK ERIC RIGGS,

        **Plaintiff,**

v.                             **Case No.: 3:14-cv-14050**

CAROLYN W. COLVIN,
**Acting Commissioner of the**
**Social Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.   Procedural History

Plaintiff, Mark Eric Riggs ("Claimant"), filed for DIB and SSI on October 22, 2010, alleging a disability onset date of February 15, 2007, (Tr. at 175, 177), due to "depression,

anxiety, seizures, mental stability, arthritis, bone degeneration." (Tr. at 203). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 25). Claimant filed a request for a hearing, which was held on December 26, 2012 before the Honorable Robert B. Bowling, Administrative Law Judge ("ALJ"). (Tr. at 42-75). By written decision dated February 6, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 25-36). The ALJ's decision became the final decision of the Commissioner on February 6, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On April 3, 2014, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on June 12, 2014. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 14). Accordingly, this matter is fully briefed and ready for disposition.

## II.    **Claimant's Background**

Claimant was 40 years old at the time of his alleged onset of disability, 44 years old when he filed the applications for benefits, and 46 years old at the time of the ALJ's decision. (Tr. at 46). He completed the tenth grade in school and communicates in English. (Tr. at 47, 202). Claimant's prior work experience includes jobs as a truck driver, tire-changer, and owner of an appliance repair business. (Tr. at 34, 204).

## III.    **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of

substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment

meets or is equal to a listed mental disorder. *Id.* *§§* 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2009. (Tr. at 27, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since February 15, 2007, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of a seizure disorder, an anxiety-related disorder, and an affective disorder. (Tr. at 27-28, Finding No. 3). Claimant also had two non-severe impairments; that being, post-traumatic stress disorder and disorders of the spine. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 28-30, Finding No. 4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladder, ropes, or scaffolds. Further, claimant must avoid all exposure to the use of moving machinery and unprotected heights. Moreover, the work must be limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and with few, if any work place changes. Finally, the claimant should only occasionally interact with the public and coworkers.

(Tr. at 30-34, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 34, Finding No. 6). Consequently, the ALJ considered Claimant's past work experience, age, and education in

combination with his RFC under the fifth and final step to determine if he would be able to engage in substantial gainful activity. (Tr. at 35-36, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the alleged disability onset date; (2) he had a limited education but could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination because the Medical-Vocational Rules supported a finding of non-disability regardless of Claimant's transferable job skills. (Tr. at 35, Finding Nos. 7-9). Taking into account all of these factors, and Claimant's RFC, and relying upon the opinion testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 35-36, Finding No. 10). At the medium exertional level, Claimant could work as a hand packager and laundry worker; at the light level, he could be a price marker or house sitter; and at the sedentary level, Claimant could perform jobs such as a grader/sorter or bench worker. (Tr. at 35-36). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act from February 15, 2007 through the date of the decision. (Tr. at 36, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence, because the ALJ failed to give proper weight to the opinion of Claimant's treating physician, Dr. Mark B. Kingston, who stated that Claimant's post-traumatic stress disorder and seizure disorder rendered him totally disabled. (ECF No. 11 at 5-7). Claimant also contends that the ALJ failed to give good reasons why he rejected Dr. Kingston's opinions although they were fully corroborated by the medical records. Claimant concedes that an ALJ may discount the opinion of a treating physician, but only

when there is "persuasive contradictory evidence" in the record supporting the ALJ's position. Otherwise, the "treating source rule" obligates the ALJ to give the opinions of a treating physician substantial, and even controlling weight. (*Id.*).

The Commissioner responds by pointing out that the ALJ acted well within his authority to reject Dr. Kingston's opinion because (1) the opinion was inconsistent with the treatment records, which reflected only conservative therapy; (2) Dr. Kingston's opinion was not well-supported by the evidence; and (3) Dr. Kingston is a family care physician, not a mental health specialist or a neurologist. Furthermore, the Commissioner emphasizes that Dr. Kingston was not Claimant's primary health care provider for his mental health and seizure issues, and generally did little more than refill his prescriptions. (ECF No. 14 at 10-11). According to the Commissioner, the ALJ gave appropriate weight to Dr. Kingston's opinion and reasonably accounted for all of the limitations supported by the record in the RFC finding.

## V.   Relevant Medical Records

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

On February 15, 2007, Claimant presented to the Emergency Department ("ED") at Three Rivers Medical Center ("TRMC") complaining of weakness and an episode of syncope that had occurred that morning before breakfast. (Tr. at 310, 334). Claimant stated that his eyes suddenly became dim, his entire head was numb, and he was weak throughout. The episode lasted approximately two hours. (Tr. at 310). Claimant indicated that he had experienced similar episodes in the distant past, but never to the extent of the

recent one. He voiced no other complaints. Claimant had no significant family or medical history. He admitted to smoking one and one half packs of cigarettes per day and occasionally drinking alcohol, but he denied illicit drug use.

Claimant was examined on February 16, 2007 by Dr. Mark Kingston, who was assigned to provide in-patient care by the ED. (Tr. at 311). Dr. Kingston found no abnormal physical findings. An EKG and a CT scan of the head were normal, as were most of Claimant's laboratory studies, including cardiac enzymes, although Claimant's blood glucose level was elevated. (Tr. at 316). Claimant's drug and alcohol screens were negative. A carotid duplex ultrasound study was ordered, and it showed no significant stenosis. (Tr. at 315). Claimant was discharged from TRMC later that day with instructions to eat a heart healthy diet and see Dr. Kingston in follow-up on February 23, 2007. (Tr. at 345).

On February 17, 2007, Claimant returned to TRMC's ED with confusion. (Tr. at 287-88). According to the ED record, Claimant had previously been at TRMC due to confusion and was released a day earlier with no known cause of his symptoms. The morning of this admission, Claimant experienced another episode of tremorous activity and confusion, which lasted about an hour. During the episode, Claimant did not recognize his wife. (Tr. at 287). Claimant was evaluated in the ED by Dr. Kingston. Dr. Kingston noted Claimant's complaints as including weakness, nausea, change in mental status, tremulousness, memory loss, change in behavior, and confusion. He had no significant medical history. On examination, Claimant appeared confused and in moderate distress. However, his physical findings were normal, including his thought content and orientation to person and place. He was admitted to the hospital for further evaluation. (Tr. at 288). Claimant underwent an EEG that was normal, but was

nonetheless started on an anti-seizure medication, Dilantin. (Tr. at 286). He was scheduled for an outpatient MRI of the head and was discharged on February 21, 2007. (*Id.*). Claimant's MRI was performed later that day and was interpreted as normal. (Tr. at 385).

Claimant consulted with Dr. Carl McComas, a neurologist, on July 12, 2007 at the request of Dr. Kingston. (Tr. at 351). With respect to Claimant's history, Dr. McComas recorded that Claimant had experienced spells of altered consciousness as far back as 1986. He had multiple evaluations with no real diagnosis. In February 2007, Claimant began having episodes during which the back of his neck tingled, he felt a pressure sensation in his head, he shook all over, and he became confused.  He was hospitalized for these episodes and recently was started on Dilantin. On physical examination, Claimant had a normal weight and blood pressure. His neurological examination was entirely normal, although his mood appeared depressed. (*Id.*). Dr. McComas concluded that Claimant might be having pseudoseizures related to panic attacks, rather than epileptic seizures. He decided to order an EEG and decrease Claimant's dosage of Dilantin. Claimant underwent the EEG on July 17, 2007. (Tr. at 350). The study revealed normal findings during wakefulness, but reflected a 14-minute psuedoseizure when applying photic stimulation.

On December 10, 2007, Claimant went to TRMC's ED with complaints of pain at multiple sites, primarily the left side. (Tr. at 352-53, 361). He advised the ED nurse that he had been kicked by a horse, and the horse had also stepped on him. (Tr. at 361-62).Claimant was seen by an ED physician to whom Claimant reported that the pain was largely in his lower back, was moderate in intensity, and was not relieved by anything. (Tr. at 352). The ED physician found nothing abnormal on examination, and Claimant's

laboratory studies likewise revealed no clinically significant abnormalities. A CT scan of the abdomen/pelvis was unremarkable. (Tr. at 355). The final clinical impression of the ED physician was contusion of the left kidney. (Tr. at 353). Claimant was discharged home after being given some pain medications and instructions to see Dr. Kingston in follow-up. (Tr. at 362-64).

On April 24 and June 4, 2008, Claimant was seen in TRMC's ED for sudden onset of seizures. (Tr. at 390-91, 409-10). In April, Claimant's wife advised that the seizure lasted approximately twenty minutes and "was worse than any he had ever had." (Tr. at 414). In both cases, the ED physician performed an examination, noting the absence of external trauma or abnormal physical findings, although Claimant appeared anxious and in moderate distress during the June visit. (Tr. at 391, 410). His laboratory studies were normal at both visits, and a CT scan of the brain taken on June 4, 2008 was also normal. Claimant was diagnosed with chronic seizures and then pseudoseizures and was discharged home in stable condition. (Tr. at 391, 402, 410).

On February 16, 2009, Claimant presented to TRMC's ED with a seizure that had occurred one hour prior to his arrival. (Tr. at 444). Claimant's wife stated that she witnessed the seizure, and it lasted approximately 5-6 minutes. She reported that Claimant had not taken his Dilantin that morning. (Tr. at 442). Claimant was examined by the ED physician, who found no obvious abnormalities. (Tr. at 436). Claimant was diagnosed with chronic seizures, given Percocet for a headache, and discharged home. (Tr. at 436, 445). He was instructed to follow-up with Dr. Kingston.

Claimant presented to the ED at TRMC on October 11, 2010 at the suggestion of Dr. Kingston for symptoms of severe anxiety and depression. (Tr. at 479). The symptoms had started three days prior to admission and had gotten progressively worse. According

to the record, Claimant had been to TRMC on two occasions in the prior four days and was treated for seizures, anxiety, and low Dilantin levels. (Tr. at 497-98, 515-17). On those visits, Claimant was told to resume taking Dilantin at home and was given two doses of Dilantin while in the ED. He was released and told to follow-up with Dr. Kingston. (Tr. at 508, 522).

On this ED visit, Claimant was evaluated by the ED physician, who admitted Claimant to the Behavioral Medicine Unit for further assessment. The working diagnosis was acute depressive disorder, suspected medication non-compliance. (Tr. at 481). The following morning, Claimant was interviewed and examined by Dr. Corazon Chua, a psychiatrist at TRMC. (Tr. at 455-58). Dr. Chua documented Claimant's reason for admission as "hearing voices." Claimant reported that he had stopped taking Dilantin approximately 3-4 months earlier and had started to hear voices and have strange ideas. He described being very "hyper" about his ideas in the morning and then slowing down in the afternoon, often repeating things 4 or 5 times. Claimant indicated that the voices and ideas had disappeared since he started taking Dilantin again. He also reported that he felt severely depressed, although he was not suicidal. His medical history was significant for pseudoseizures. There was no history of psychiatric problems in his family.

Dr. Chua performed a mental status examination, noting that Claimant was cooperative and verbal, with clear and coherent speech. (Tr. at 456). His affect/mood was depressed, but his thought processes were normal and sensorium was clear. Claimant was found to be oriented to person, place, and time. However, his insight and judgment were poor. (*Id.*). Claimant's attention, concentration, and abstract reasoning were intact; his memory was "fair," and he was "fairly reliable." (Tr. at 456-57). Dr. Chua diagnosed Claimant with depressive disorder, not otherwise specified ("NOS"); rule out psychosis,

NOS; rule out medication induced disorder; rule out conversion disorder. (Tr. at 458).

Claimant remained in the hospital an additional day and received medications. On the morning of October 13, 2010, he reported feeling fine, with no depression or anxiety and no suicidal thoughts. (Tr. at 453). He felt the medications were working. Claimant was discharged to home with instructions to follow-up at Prestera Centers for Mental Health ("Prestera"). His final diagnosis was depressive disorder, NOS; anxiety disorder, NOS; and factitious disorder. (*Id.*).

Claimant had his initial visit with Prestera on October 20, 2010. (Tr. at 694-98). At that time, several staff members met with Claimant and completed a patient database. Claimant described his chief complaint as longstanding depression and anxiety, which he related to abuse he suffered as a child. (Tr. at 694). Claimant denied any prior outpatient counseling, but stated that he had two psychiatric admissions to TRMC. Claimant provided social, family, work, and legal history. His working diagnosis was major depressive disorder, moderate, and anxiety disorder, NOS. (Tr. at 697). His GAF score was 60.[1]

A second database was completed by Tammy Chaney, B.A., which provided more detail about Claimant's symptoms, history, and level of functioning. (Tr. at 681-88). Under level of functioning, Claimant was noted to have no impairment related to

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that scores "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

activities of daily living, and limited impairment with relationships and social situations. (Tr. at 684). Claimant had a variety of symptoms, which on a scale of "not present," "mild," "moderate," "severe," and "acute/crisis," had an acuity ranging from "mild" to "moderate." (Tr. at 666). Ms. Chaney performed a mental status examination, documenting normal findings for the most part, with the exception that Claimant was withdrawn in sociability, overwhelmed in coping, and displayed a restricted affect. (Tr. at 687-88). He was scheduled to see both a psychiatrist and an individual therapist.

Claimant's initial appointment with Dr. Nika Razavipour, a psychiatrist working at Prestera, occurred on November 11, 2010. (Tr. at 699). Dr. Razavipour went through Claimant's recent symptoms and concerns, as well as his medications, and discussed his medical treatment. Dr. Razavipour also conducted a mental status examination, finding Claimant to be depressed and anxious. Claimant described having auditory hallucinations in which God told him how to kill himself. Dr. Razavipour diagnosed Claimant with post-traumatic stress disorder and assigned him a GAF score of 48.[2] Claimant was placed on a trial of Celexa and Clonidine, and told to continue Klonopin, reduce Effexor, and initiate individual therapy.

Claimant began individual therapy with Debra Stephens, Licensed Social Worker, MSW, on November 17, 2010. (Tr. at 650). Ms. Stephens noted that Claimant had depression and anxiety related to childhood abuse. At the present, he was feeling hopeless and helpless due to his unemployment and seizure activity. Ms. Stephens discussed these issues with Claimant and recommended continued therapy.

On November 22, 2010, at a follow-up session, Dr. Razavipour learned that

---

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). DSM-IV at 32.

Claimant was taking Dilantin and Clonidine, but still had symptoms, including poor concentration ringing in his ears, irritability, and anger. (Tr. at 643). Claimant's GAF score was 50. Dr. Razavipour decided to continue Claimant on Celexa and increase his Clonidine dosage. Claimant was instructed to continue therapy with Ms. Stephens. By December 6, 2010, Claimant reported having some issues with Clonidine. (Tr. at 702). He also indicated that his family doctor would no longer prescribe Klonopin and Dilantin. Dr. Razavipour decided to gradually taper off Claimant's Dilantin given a recent EEG that was negative for epileptic activity. Dr. Razavipour also stopped Clonidine. In place, Claimant was given Risperdal, and was told to continue Klonopin and Celexa. He was also instructed to continue individual therapy. On this visit, Claimant's GAF score was 55. Claimant returned to Dr. Razavipour in January and February 2011, and his medications were tweaked. (Tr. at 703-04).

Claimant missed multiple individual therapy sessions, but returned to Prestera to see Ms. Stephens on March 14, 2011. (Tr. at 678). Claimant reported having recent stressors involving his lack of income and his father-in-law. Ms. Stephens discussed the stressors with Claimant and made suggestions on how to cope with them. She felt that they would need to work on improving Claimant's mood while addressing his childhood history of abuse.

On May 2, 2011, Claimant met with Dr. Razavipour. (Tr. at 624). Claimant reported that he was still depressed, angry, irritable, and anxious. He stated that he had auditory hallucinations that he believed was God's voice telling him how to kill himself, or encouraging him to build a power plant. He continued to have problems sleeping, as well. Claimant's medication dosages were tweaked, and he was instructed to follow-up with Ms. Stephen's for individual therapy. (*Id.*). Claimant had individual therapy with Ms.

Stephens on May 8, 2011, and they agreed to work on his core negative feelings. (Tr. at 629).

Claimant next Dr. Razavipour on June 30, 2011. (Tr. at 618). On this visit, Claimant reported feeling less anxious and depressed. His medication regimen of Risperdal, Celexa, and Klonopin was continued. Claimant returned to Dr. Razavipour's office on November 3, 2011. (Tr. at 608). He advised that he could no longer afford Risperdal due to his wife being out of work. Claimant continued to complain of sleep-related issues and nervousness. Dr. Razavipour increased Claimant's Risperdal prescription and arranged get him assistance with the cost of the drug. Claimant was additionally ordered to take Haldol, Celexa, and Klonopin.

Claimant had individual therapy with Ms. Stephens on October 20, 2011 and November 17, 2011. (Tr. at 613, 615). They primarily discussed Claimant's grave financial situation and his feelings related to that issue. Ms. Stephens indicated in October that Claimant was depressed and anxious, and was feeling overwhelmed with his situation. However, by the November session, Claimant's mood was noted to be improving. (Tr. at 613).

### B. RFC Opinions

On March 1, 2011, Bob Marinelli, Ed.D., completed a Psychiatric Review Technique. (Tr. at 552-64). Dr. Marinelli opined that there was insufficient evidence in the record to establish the presence of a psychiatric impairment. (Tr. at 552, 564). Dr. Caroline Williams reached a similar conclusion on March 8, 2011 with respect to Claimant's Physical Residual Functional Capacity Assessment, noting that the evidence was not adequate to assess Claimant's allegations for the time period of February 15, 2007 to December 31, 2009, the date Claimant was last insured for DIB. (Tr. at 573).

Dr. Williams re-evaluated Claimant's allegations on March 15, 2011 and this time completed a Physical Residual Functional Capacity Assessment form. (Tr. at 574-81). She opined that Claimant had no exertional, manipulative, visual, or communicative limitations. However, Dr. Williams felt Claimant should never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards, such as machinery and heights. She did not find Claimant's allegations to be entirely credible, stating that his purported symptoms and alleged disability were disproportionate to the medical evidence. (Tr. at 579). Dr. Williams's assessment was affirmed by Dr. Pedro Lo on October 4, 2011, after he completed a review of the record. (Tr. at 607).

On April 25, 2011, Claimant was assessed by Lisa Tate, a Master's Degree-level psychologist, at the request of the West Virginia Disability Determination Service. (Tr. at 582-86). Claimant drove himself to the examination and was accompanied by his wife. He was well-groomed, with good posture and a normal gait. He had no vision or hearing problems and presented an Ohio driver's license for identification. Claimant's chief complaints were depression, anxiety, and medical problems. He reported that he felt depressed all of his life, but five years earlier, the symptoms had worsened. (Tr. at 583). He described having continuous depression with associated symptoms of fatigue, sleep difficulty, social withdrawal, loss of interest in activities, varied appetite, feelings of hopelessness and helplessness, irritability, and daily anger spells. Claimant also reported feelings of anxiety that had been present approximately eight years and were accompanied by panic attacks during which he would have difficulty breathing, heart palpitations, chest pain, and hyperventilation. (*Id.*).

Ms. Tate reviewed records from Claimant's psychiatric admission to TRMC, as well as a clinical interpretative summary from Prestera. She asked Claimant about his medical

history, and he advised that he had no recent injuries, illnesses, or hospitalizations. Claimant reported his history of pseudoseizures and provided a list of his current medications. He admitted to smoking two packs of cigarettes per day, having started smoking at age 17. His family history was negative for any significant health problems. He stated that his parents and siblings were all alive and had no known medical issues. (Tr. at 584). Claimant described his psychiatric history as including one admission to TRMC and four to five months of outpatient therapy offered through Prestera. Claimant detailed his educational and vocational history, indicating that he dropped out of high school in the 11th grade and worked as a truck driver for approximately twenty years. His last job involved working in appliance repair at a shop owned by his father, but the job ended four or five years earlier when the business closed.

Ms. Tate performed a mental status examination. (Tr. at 584-85). She found Claimant to be alert and oriented, although his mood was depressed and his affect was mildly restricted. Claimant's thought content was normal, as was his thought processes. Claimant denied suicidal thoughts, and his judgment was gauged to be normal, while his insight was fair. Claimant's remote, recent, and immediate memory and concentration were normal. Ms. Tate diagnosed Claimant with major depressive disorder, single episode, chronic with anxious features, and panic disorder without agoraphobia. (Tr. at 585). She documented Claimant's daily activities as including watching television, sleeping intermittently throughout the day, and trying to "mess around the house with some stuff." (*Id.*). Claimant showered once or twice each week; checked at least once per week on his in-laws' horses; went to the convenience store two or three times per week; and visited his parents once or twice each month. He liked to "tinker" with items, like his lawn mowers. Claimant's social functioning, persistence, and pace were observed to be

within normal clinical limits. (Tr. at 586).

On May 10, 2011, based in part on Ms. Tate's clinical evaluation, Dr. Marinelli completed a second Psychiatric Review Technique. (Tr. at 588-601). He opined that Claimant had nonsevere impairments of affective disorder and anxiety-related disorder. (Tr. at 588). The affective disorder was identified as major depressive disorder with anxious features, and the anxiety-related disorder was panic disorder without agoraphobia versus post-traumatic stress disorder. Dr. Marinelli felt that Claimant's impairments mildly limited his activities of daily living, social functioning, and ability to maintain concentration, persistence, and pace. (Tr. at 598). Claimant had no episodes of decompensation of extended duration. According to Dr. Marinelli, the evidence did not establish paragraph "C" criteria for either impairment. He felt that Claimant's reported symptoms were generally consistent with Ms. Tate's evaluation and, therefore, appeared credible. (Tr. at 600). Dr. Marinelli's opinions were affirmed on September 17, 2011 by James Binder, M.D., who performed a review of the record and completed a case analysis. (Tr. at 606).

On February 28, 2012, Claimant was evaluated at the request of his attorney by Susan Bartram, a Master's Degree-level psychologist working at River Valley Associates in Barboursville, West Virginia. (Tr. at 705-09). Ms. Bartram's initial observations of Claimant were quite similar to those of Ms. Tate, and Claimant's symptoms and chief complaints were also largely the same. (Tr. at 705). Ms. Bartram reviewed medical records from Dr. McComas and Prestera. She apparently also had the evaluation report prepared by Ms. Tate, although Ms. Bartram's reference to the report is somewhat confusing given that she discussed a report prepared on May 13, 2011, when Ms. Tate actually saw Claimant on April 25, 2011 and issued her report on May 4, 2011. In any

event, the medical, social, family, educational, and vocational history provided by Claimant to Ms. Bartram was consistent with the information he provided to Ms. Tate. (Tr. at 706).

Ms. Bartram administered a Wechsler Adult Intelligence Scale and a Wide Range Achievement Test. Claimant had a full scale IQ of 82, which Ms. Bartram determined was a valid score. (Tr. at 706-07). She also conducted a mental status examination. (Tr. at 707-08). She observed that Claimant appeared depressed with a blunt affect, but had normal thought processes and thought content. Claimant's insight was noted to be fair; his judgment was normal; his remote memory and immediate memory were normal, but his recent memory was impaired. Ms. Bartram diagnosed Claimant with post-traumatic stress disorder; major depressive disorder, recurrent, chronic with anxious features; and panic disorder, without agoraphobia. (Tr. at 708). Ms. Bartram described Claimant's activities to include sleeping, some shopping, periodic tending to his in-laws' horses, and watching television. She opined that Claimant's concentration and social functioning were impaired, but his persistence and pace were normal. (Tr. at 709). However, based upon Claimant's intellectual ability, reading and writing scores, and her clinical observations, Ms. Bartram felt Claimant's prognosis was poor, even with continued therapy.

On December 21, 2012, Dr. Kingston wrote a letter addressed to Claimant's attorney in which he stated that Claimant suffered from post-traumatic stress disorder with severe symptoms at times, including panic episodes, chronic anxiety, and depression, and he was being followed by Prestera for these issues. (Tr. at 717). In addition, Dr. Kingston noted that Claimant had pseudoseizures for which he saw a neurologist. Dr. Kingston opined that "[b]oth of these conditions have disabled

- 19 -

[Claimant] from gainful employment." (*Id.*). Dr. Kingston expressed his belief that the conditions were permanent and would likely disable Claimant permanently. (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   <u>Analysis</u>

As previously stated, Claimant's sole challenge to the Commissioner's disability

determination involves the weight given by the ALJ to the December 2012 letter supplied by Dr. Kingston, Claimant's primary care physician. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. §§ 404.1527(c), 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given *controlling* weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3]

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

"Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. 1996). Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id*. at *2. "The regulations provide that the final responsibility for deciding issues such as

these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review;" otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). Although 20 C.F.R. §§ 404.1527(c),416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon the various factors, the regulations do not explicitly require the ALJ to regurgitate in the written decision every facet of the analysis. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2).

Here, the ALJ complied with the applicable regulations by considering all of the

medical source statements—including Dr. Kingston's December 2012 letter—in conjunction with the other evidence. (Tr. at 33-34). Starting first with anecdotal records and Claimant's testimony, the ALJ observed that, despite having daily symptoms, Claimant was capable of performing all activities of daily living independently. He was able to care for his two dogs and periodically care for his in-laws' horses. (Tr. at 31). Claimant was also able to load the dishwasher, help clean the house, watch television, drive, shop, and visit with family. He had good relationships with his step-children, other family members, friends, and neighbors.

Moving next to the medical evidence, the ALJ reviewed the records pertaining to Claimant's seizures and pseudoseizures, pointing out that two CT scans of Claimant's head, two EEG studies performed five months apart, and an MRI of Claimant's brain failed to yield any significant findings. (Tr. at 31-32). Moreover, treatment notes confirmed the absence of intracranial abnormalities. The ALJ correctly concluded that the records showed no objective evidence of serious neurological impairment. According to the ALJ, the clinical records suggested that most of Claimant's acute episodes were related to medication non-compliance, rather than an underlying condition that was disabling even when properly treated. With regard to Claimant's psychiatric impairments, the ALJ stressed that most of Claimant's mental status examinations were normal, and he admitted to feeling less depressed when medicated. (Tr. at  32). The ALJ agreed that Claimant's affective and anxiety-related disorders were severe, but not to the degree that they would prevent him from engaging in work-related activities. The ALJ discussed the consultative examinations performed by Ms. Tate and Ms. Bartram, highlighting the similarities in their observations and findings. (Tr. at 32-33).

After analyzing the medical information, the ALJ specifically addressed the

opinions of Dr. Williams, Dr. Marinelli, Dr. Binder, Ms. Tate, Ms. Batram, and Dr. Kingston. (Tr. at 33-34). He gave great weight to Dr. Williams's assessment of Claimant's physical functional capacity because it was consistent with the medical evidence. The ALJ noted that Dr. Williams prohibited Claimant from climbing ladders, ropes, and scaffolds, and from exposure to hazards, to account for his pseudoseizures. The ALJ gave only partial weight to the opinions of Dr. Marinelli and Dr. Binder, who found Claimant's psychiatric impairments to be non-severe. The ALJ explained that while he agreed that Claimant had non-severe post-traumatic stress disorder, he felt the evidence supported a finding that Claimant's depression and anxiety were severe. He accepted Ms. Tate's opinion that Claimant's social functioning, persistence, pace, and concentration were normal, and also accepted similar findings by Ms. Bartram related to Claimant's persistence and pace. He rejected Ms. Bartram's conclusion that Claimant's social functioning was "guarded," because that conclusion was contrary to other findings included in Ms. Bartram's evaluation note. Finally, the ALJ explicitly gave little weight to the "treating source" statement expressed by Dr. Kingston in his December 2012 letter, which indicated that Claimant's post-traumatic stress disorder and seizures were permanently disabling, because the statement was "inconsistent with the medical evidence noted above and with the other opinion evidence in the record." (Tr. at 34).

Clearly, the ALJ complied with Social Security regulations and rulings in the manner in which he assessed the opinions. He expressly weighed each opinion and briefly explained the reason for the weight given to the opinion. The ALJ considered all of the evidence in making his determinations, including objective findings; testimony; Claimant's reported daily, weekly, and monthly activities; and the effects of treatment. Having assessed the substance of the ALJ's discussion, and comparing it to the record,

the undersigned agrees that substantial evidence supports a finding that Claimant is not disabled under the Social Security Act. Physically, Claimant has few problems. Indeed, he was regularly observed as having a normal gait; full range of motion in all extremities and spine; normal tone, muscle strength, and sensation; normal respirations; normal cardiac rhythm and rate; and no obvious deformities or abnormalities. (Tr. at 287, 311, 351, 353, 391, 410, 436, 480, 498, 516). Claimant alleges seizures as a physical impairment; however, despite an extensive work-up, no objective testing corroborated the presence of epileptic seizures. In their place, Claimant ultimately was diagnosed with pseudoseizures, also called "psychogenic non-epileptic seizures" (PNES), a clinical feature of the psychological condition known as conversion disorder. *See* DSM-5 at 318-19.

In 2007, Claimant began receiving psychotropic medication from his family physician, and in 2010, he initiated therapy with a psychiatrist and licensed social worker at Prestera. Claimant's mental status examinations have been largely unremarkable with the exception of depressed mood and restricted affect. His symptom acuity, as documented by Prestera in October 2010, was "mild" to "moderate" on a scale that included more acute ratings of "severe" and "crisis." (Tr. at 658-59). Throughout this period, Claimant was able to perform his daily activities, drive, shop, visit with family and friends, care for animals, attend physician appointments, and "tinker" around the house. Claimant could operate equipment, such as a manual metal grinder, (Tr. at 428), attend to horses, (Tr. at 361), mow the yard, and help with household cleaning chores. (Tr. at 63). Further, the agency consultants that evaluated Claimant's mental residual function opined that his psychiatric symptoms did not substantially interfere with his ability to work. Accordingly, substantial evidence in the record supports the ALJ's determination.

Finally, contrary to Claimant's contention, the ALJ was not required to apply the

"treating source rule" to the opinion expressed by Dr. Kingston in his December 2012 letter. Dr. Kingston's statement that Claimant's conditions "disabled him from any gainful employment" plainly constitutes an opinion on an issue reserved to the Commissioner; as such, it is treated under the regulations and rulings as an administrative conclusion, not as a medical opinion that must be given heightened consideration. While the ALJ was bound to consider Dr. Kingston's statement, he was not obligated to give it controlling weight or special significance. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir. 2005).

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to counsel of record.

**ENTERED:**  July 23, 2015

Cheryl A. Eifert
United States Magistrate Judge